# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND RAYFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV1842MLM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael Astrue ("Defendant") denying the application for Supplemental Security Income ("SSI") under Title XVI of the Social security Act, 42 U.S.C. § 401, 1381 et. seq. filed by Plaintiff Raymond Rayford ("Plaintiff").[1] Plaintiff filed a Brief in Support of the Complaint. Doc. 14. Defendant filed a Brief in Support of Answer. Doc. 18. Plaintiff filed a Reply. Doc. 19. The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 6.

## PROCEDURAL HISTORY

On October 17, 2006, Plaintiff filed an application for SSI, alleging a disability onset date of June 24, 1991. Tr. 96-98. Plaintiff's claim was denied on February 7, 2007, and he filed a request for a hearing before an Administrative Law Judge ("ALJ"). Tr. 47-51, 52. A hearing was held before an ALJ on September 23, 2008. Tr. 22-45. By Decision dated March 16, 2009, the ALJ found

---

[1] Plaintiff is interchangeably referred to as "Raymond Rayford," "Raymond Moore," and "Raymond Rayford-Moore" in the record. "Moore" is the last name of Plaintiff's biological father and "Rayford" is the last name of Plaintiff's stepfather and mother.

Plaintiff not disabled. Tr. 9-20. The Appeals Council denied Plaintiff's request for review. Tr. 1-3. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

**A. Testimony of Plaintiff's Mother:**

Plaintiff's mother, Priscilla Rayford ("Mrs. Rayford"), testified that, at the time of the hearing, Plaintiff was taking GED classes; that Plaintiff had been "put out" of Ethel Hedgeman Lyle Academy Charter High School ("E.H. Lyle") for failing grades; that Plaintiff had then enrolled at Cleveland ROTC High School ("Cleveland"); and that, subsequently, Plaintiff was "put out" of Cleveland both for failing grades and behavior problems. Tr. 26-27. Mrs. Rayford also testified that Plaintiff had behavior problems at home and at school; that Plaintiff had a confrontation with his stepfather; and that Plaintiff had said he wanted to kill himself and his stepfather. Tr. 27.

Mrs. Rayford further testified that Plaintiff had been prescribed Concerta in 2007; that Plaintiff had been prescribed Seroquel on August 14th, 2008; and that, at the time of the hearing, Plaintiff was a seeing licensed social worker, Will Slotky, and a psychiatrist, Dr. Michael Shanker, and that she and Plaintiff were seeing family therapist Paula Ellis, at the Family Support Network. Tr. 28.

With regard to Plaintiff's physical health, Mrs. Rayford testified that Plaintiff had been diagnosed with epilepsy at the age of three months and prescribed Depakote; that doctors had taken Plaintiff off Depakote in March 2008 because he seemed to have stopped having seizures; that Plaintiff was currently having "continuous" nosebleeds and "severe" headaches; and that Plaintiff had not have a seizure in the two years prior to the hearing. Tr. 28-29.

Regarding Plaintiff's social and school life, Mrs. Rayford testified that Plaintiff had only one friend; that his health problems prevented him from playing sports; that his inability to play sports angered Plaintiff; that Plaintiff had once struck another student; that Plaintiff had "a problem with

2

striking people"; that, when at home, Plaintiff needed to be reminded to finish chores; that Plaintiff often complained of headaches and dizziness; that Plaintiff played roughly with his young niece; that Plaintiff had a part-time job; and that Plaintiff's supervisors said Plaintiff moved too slowly in his work. Tr. 29-32.

### B.     Plaintiff's testimony:

Plaintiff testified that he had anger problems; that he got into a lot of fights and received a lot of referrals for skipping class or hitting other students while at Cleveland; that after transferring to E. H. Lyle for tenth grade, he returned to Cleveland to repeat tenth grade; that he had problems dealing with "a couple" of teachers and other students; and that, at the time of the hearing, he was working part-time doing odd jobs at a deli. Tr. 33-34.

Plaintiff also testified that he was no longer having seizures; that he did not know whether his headaches and nosebleeds were related to his epilepsy; that he thought his headaches occurred about once a week; that the headaches could come on at any time; and that sometimes taking ibuprofen helped the headaches. Tr. 35-36.

Plaintiff further testified that since he began taking GED classes he no longer got into fights; that while at Cleveland, he got into a fight approximately once every two months; that while at Cleveland, he got into verbal confrontations "all the time"; that while in school, he did not do his homework; that he did his homework for his GED classes; that he thought he did his GED homework because his GED classes were comprised of "grownups" rather than students; that his GED classmates were "nice people" and so he did not pick fights; and that he was committed to getting his GED. Tr. 36-37.


### C.     Testimony of the Medical Expert:

Gary C. Horner, Ph.D., testified as a Medical Expert. Dr. Horner testified that Plaintiff was diagnosed with a communication disorder in November 2006; that Plaintiff had a history of seizures; that Plaintiff was diagnosed with attention deficit hyperactivity disorder ("ADHD") in January 2006; that Plaintiff was taking Risperdal and Concerta; that Plaintiff was prescribed another drug in June 2005; that Plaintiff was diagnosed with attention deficit hyperactive disorder, oppositional defiant disorder, and was given a global assessment functioning ("GAF") score of 60 in January 2007; and that the ME considered these "the appropriate diagnoses."[2] Tr. 39-40.

Dr. Horner further testified that, in his opinion, none of these impairments individually met the criteria of the listed impairments in the Listings of Impairments; that while Plaintiff "ha[d] had some failing grades … he's also had some very nice grades"; that Plaintiff had been described as a "bright youngster"; that Plaintiff reported writing a book; that Plaintiff had won a prize for a poem he had written; that Plaintiff appeared to have no problem acquiring or utilizing information; that Plaintiff possessed good social skills; that Plaintiff "[did] clearly have some anger issue[s]"; that Mr. Slotky described Plaintiff as very like other teenagers; that a social worker had noted that Mrs. Rayford made her son's life "a living hell"; and that for these reasons, the ME did not believe Plaintiff met the requirements of the Listing. Tr. 40-41.

Asked by the ALJ about each of the domains used by Social Security to evaluate children, Dr. Horner testified that, in his opinion, the limitation on Plaintiff's ability to acquire and utilize

---

[2]     Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

information was less than marked; that the limitation on Plaintiff's ability to attend and complete tasks was less than marked; that the limitation on Plaintiff's ability to interact and relate to others was less than marked; that Plaintiff's ability to move about and manipulate objects suffered no limitation; that the limitation on Plaintiff's ability to care for himself was less than marked; and that Plaintiff's health and physical well-being suffered no limitation. Tr. 41-43.

On January 7, 2009, Dr. Horner submitted a letter containing a revised assessment of Plaintiff's condition after reviewing additional medical records submitted by Plaintiff's attorney. Tr. 256. The ME stated that the records from Mr. Slotky indicate that Mr. Slotky found the "critical factor" in Plaintiff's problems was his relationship with his parents and that Plaintiff's seizure disorder was "no longer active." Tr. 256. Further, Dr. Horner's letter states that medical records from Dr. Shanker "do not indicate any severe/extreme issues"; that Dr. Shanker's notes report problems with Plaintiff's family; that Dr. Shanker rated Plaintiff with a "Marked" limitation in several areas on Dr. Shanker's Medical Source checklist; and that Dr. Horner believed that Dr. Shanker's notes "do not support" Dr. Shanker's "Marked" ratings. Tr. 258. Dr. Horner concluded that the additional records did not change his opinion that Plaintiff does not "meet[] or equal[] the listings of disability as shown in the Social Security Manual."[3] Tr. 258.

### III.
### MEDICAL RECORDS

Records from Cardinal Glennon Children's Hospital ("Cardinal Glennon") Emergency Room reflect that Plaintiff presented on April 19, 2005, complaining of a headache; that Plaintiff was unable to close his eyes; and that the Plaintiff was instructed to take Tylenol. Tr. 280-282.

---

[3]     The second page of Dr. Horner's letter is not legible.

Neurologist Glen Fenton, M.D., reported, on June 30, 2005, that Plaintiff was seen for follow-up from his April 19, 2005 emergency room visit; that Plaintiff suffered from a "generalized seizure disorder, tonic clonic seizures, and absence events"; that Plaintiff took Depakote in the morning and at night to control his seizures; that Plaintiff did not have recurrent seizures; that Plaintiff had suffered an "unusual episode" in April 2005; that during this episode, Plaintiff developed a "febrile illness," pain in his eyes which prevented him from closing his eyes, change in sight, and suffered periods where he was "spaced out"; that Plaintiff was taking Tenex to treat oppositional behavior; that there were "significant interpersonal difficulties" between Plaintiff and his mother; that it was recommended that Plaintiff's mother set up counseling; and that Plaintiff's epilepsy was controlled with Depakote. Tr. 277-278, 400-401.

Michael Shanker, M.D., a psychiatrist, completed a diagnostic evaluation of Plaintiff on October 12, 2005. Dr. Shanker reported that Plaintiff said that his problems had worsened when he reached middle school; that he wanted to run away and be left alone when his mother yelled at him; that he had not been sexually active since he was shown pictures of STDs; that he could "whoop" everyone; that he planned to become a comedian; and that his mother did not believe he would make it as a comedian. Dr. Shanker reported that Plaintiff had ADHD and a GAF of 55. Tr. 413-417.

Case notes reflect that Plaintiff first saw licensed social worker Will Slotky on October 24, 2005, on which date Mr. Slotky reported that Plaintiff's mother said that Plaintiff "look[ed] up" to his older siblings, both of whom had been incarcerated; that Plaintiff did not like taking medications; that Plaintiff was "not affectionate" towards his mother; that Plaintiff admitted to smoking marijuana and cigarettes; that Plaintiff said he kept weapons in his room in order to protect himself and his mother in their "unsafe neighborhood." Mr. Slotky further reported that Plaintiff exhibited "[c]lassic ADD" and "adjustment to adolescence issues"; and that Plaintiff would benefit from "a smaller class

size, more individualized attention, an individualized education plan ("IEP"), as well as adjustment on the medications." Tr. 303-304.

Case notes from Plaintiff's session with Mr. Slotky on November 7, 2005, state that Plaintiff was adding an after school program to assist him in completing his homework; that Plaintiff's difficulty paying attention in school could be remedied by adjusting his ADD medication or increasing his dosage of Depakote; and that Plaintiff's mother complained about the same behavior issues which were discussed on October 2005. Tr. 304-305.

Unsigned progress notes, dated November 9, 2005, from St. John's Mercy Medical Center—Behavioral Health ("St. John's") state that Plaintiff was earning three Fs, 3Ds, one A, and one C in school; that Plaintiff's older brother used drugs; that Plaintiff's mother said she would call the police if she found drugs in Plaintiff's room again; that she had found a knife and pornography in his room; that Plaintiff denied sexual activity; that Plaintiff kept condoms in his room; and that Plaintiff had been shown pictures of STDs. Tr. 412.

Mr. Slotky's case notes, dated November 15, 2005, state that Plaintiff's mother reported Plaintiff's behavior was better and that he was "not doing well with the school work"; that Plaintiff's mother was concerned about his transportation to school; and that the possibility of Plaintiff's joining a sports team was discussed. Tr. 305.

In a letter dated November 21, 2005, Mr. Slotky wrote that Plaintiff had "abandonment issues aplenty"; that Plaintiff was "left with an overprotective mom that may have him misdiagnosed"; that Plaintiff was "articulate"; that Mr. Slotky believed Plaintiff primarily required "a medication/environment adjustment"; and that Plaintiff's sexual activity and disruptive behavior were "common traits for the teens of today." Tr. 302.

Case notes from Plaintiff's session with Mr. Slotky on November 21, 2005, state that

Plaintiff's stepfather attended the session; that "communication [was] at an all time low with the family"; that Plaintiff "had noted that he wanted to commit suicide"; that Plaintiff's mother was "tremendously reactive"; that Plaintiff's mother was concerned about an inappropriate letter Plaintiff had written and graphic pictures he had sent to "a young girl he met on the internet"; and that Mr. Slotky believed Plaintiff would benefit from "allowing the natural consequences to occur." Tr. 305-306.

On December 20, 2005, Mr. Slotky reported that Plaintiff had raised some of his grades and that Plaintiff was writing a "semi-autobiography." Tr. 206.

Records from Cardinal Glennon show that Plaintiff had an EEG on January 4, 2006; that the EEG was "abnormal"; that the EEG demonstrated "rare generalized spike and slow wave discharge"; and that Plaintiff's EEG was "consistent with tendency towards generalized seizures." Tr. 274. On the same date, Dr. Fenton examined Plaintiff and noted that there had been confusion regarding Plaintiff's dose of Depakote; that Plaintiff would be prescribed 500 mg extended release tablet of Depakote; that Plaintiff had not had "breakthrough seizures"; that Plaintiff was also taking Risperdal to help control his anger and Concerta to treat his ADHD; and that Plaintiff was failing two classes in school and was in danger of being disenrolled from Cleveland. Tr. 275-276, 397-398.

Mr. Slotky's notes reflect that Plaintiff was seen on January 4, 2006. Mr. Slotky reported on this date that Dr. Shanker had changed Plaintiff's medication regime, increasing Plaintiff's dosage of Depakote and adding Risperdal and Concerta to control Plaintiff's ADHD; that Plaintiff's mother stated that they had fewer arguments; and that Mr. Slotky believed experiencing "[n]atural consequences for his actions at school [would] help" Plaintiff. Tr. 306-307.

On February 2, 2006, Mr. Slotky noted that the household was "more stable"; that Plaintiff's mother had been "calling the counselors repeatedly and annoying them [] all the time"; that Plaintiff's

mother did not believe the counselors were helpful; and that Plaintiff talked about the history of the KKK. Tr. 307.

Records reflect that Plaintiff was seen for a follow-up appointment at Grace Hill Neighborhood Health Center ("Grace Hill") on February 8, 2006. Tr. 316.

Unsigned progress notes of February 15, 2006, from St. John's reflect that Plaintiff said pictures of STDs had scared him; that some of Plaintiff's friends had been "locked up"; that Plaintiff enjoyed reading about the Black Panthers, the KKK, and police brutality; that Plaintiff's mother said his behavior was better; that Plaintiff said he had learned not to talk when his mother yelled; and that Plaintiff suffered from Intermittent Explosive Disorder in addition to the disorders already diagnosed. Tr. 410.

Mr. Slotky's notes of February 20, 2006, state that Plaintiff's psychiatrist had suggested adding Ritalin to Plaintiff's medications; that Plaintiff's mother did not like this suggestion; that Plaintiff's mother was concerned about the "harsh language" in the "pseudo-biography" Plaintiff was writing; and that Plaintiff's mother tended to overreact. Tr. 307-308.

Mr. Slotky's notes of March 20, 2006, state that Plaintiff's mother had "threatened juvenile detention" for Plaintiff; that Plaintiff's mother told everyone about Plaintiff's medications; that Plaintiff's mother downplayed Plaintiff's writing abilities; that Plaintiff said his mother called him "crazy" and that she said he "belong[ed] in a mental institution"; and that he discussed with Plaintiff and his mother how to deal with family communication and allow Plaintiff to take responsibility for his own actions. Tr. 308.

On April 3, 2006, Mr. Slotky reported that Plaintiff and his mother were "[m]uch better" and "[a]cknowledged progress." Tr. 308.

On April 17, 2006, Mr. Slotky reported that Plaintiff's mother's was concerned that Plaintiff

would follow in his brother's "illegal footsteps," and that stated that Plaintiff's behavior at school was much improved. Tr. 308-309.

Notes from Plaintiff's sessions with Mr. Slotky from May 16, 2006, through October 23, 2006, reflect that Plaintiff's mother was concerned that Plaintiff would follow the example of his older brother; that Plaintiff's drug use was a concern; that Plaintiff's behavior at school improved; that the relationship between Plaintiff and his mother was difficult; and that Mr. Slotky believed Plaintiff's mother to be overprotective and reactionary. Tr. 309-313.

Unsigned progress notes, dated June 6, 2006, from St. John's state that Plaintiff was earning three Bs and three Cs in school; that Plaintiff liked to write poems; that Plaintiff had burned paper in his room; that Plaintiff had broken off the VCR flap on the TV; that Plaintiff did not "wipe himself"; and that Plaintiff was taking Concerta, Risperdal, and Depakote. Tr. 409.

On July 13, 2006, Dr. Fenton reported that Plaintiff was seen for follow-up; that Plaintiff was fifteen years old at the time of this visit; that Plaintiff's generalized seizure disorder was well controlled with Depakote; that Plaintiff reported no "new troubles" and that he was "enjoying his summer out of school, [was] reading, and [was] working on writing his own novel and poetry"; that Plaintiff had "no significant intercurrent illnesses or injuries"; that Plaintiff was alert and cooperative, with normal speech; that Plaintiff followed commands accurately"; that his cranial nerves were "grossly intact"; that Plaintiff's muscle tone and strength were normal; that his reflexes were brisk and symmetric; that his stance and gait were normal; that no tremor was seen; that his sensation was intact; and that Plaintiff was to follow-up in six months. Tr. 393-94.

Dr. Fenton stated in a letter signed August 1, 2006, that Plaintiff was being treated with medication for a seizure disorder; that because of this disorder he required door-to-door bus service for school; and that the suggested location of his bus pick up would enable Plaintiff's mother to keep

a close eye on him for potential seizures while he waited for the bus. Tr. 269.

Unsigned notes dated August 21, 2006, from St. John's state that Plaintiff felt his mood was better; that Plaintiff felt he was getting along with his mother; that Plaintiff denied using marijuana; that Plaintiff was seizure free; that Plaintiff was complying with his medications; that Plaintiff was taking Concerta, Risperdal, and Depakote; that Plaintiff was trying to keep his room clean; that Plaintiff was hanging out with his brother; that Plaintiff's mother said Plaintiff was not affectionate; that Plaintiff's mother said Plaintiff's behavior was better; and that Plaintiff's mother said Plaintiff slammed doors and threw things. Tr. 408.

On September 22, 2006, Plaintiff and his mother met with case worker Erica Mayborne from the St. Louis Regional Center for Developmental Disability of the Missouri Department of Mental Health and developed a support plan for the period from October 1, 2006, through September 30, 2007. This plan stated that Plaintiff had "a lot of displaced anger"; that plaintiff was "aware of his anger but [did] not know how to control it"; that Plaintiff was angry when his mother suggested that he be placed in special education; that Plaintiff feared "how the 'special education' kids are treated"; that Plaintiff "[could] relate to people when he want[ed] to"; that Plaintiff was enrolled in an anger management class at school; that Plaintiff had a history of seizures; that Plaintiff had been diagnosed with ADHD; that Plaintiff exhibited angry and disrespectful behavior at home and at school; that Plaintiff understood "'right vs. wrong'"; and that a "case manager or school advocate" should accompany Plaintiff's mother to school meetings to ensure that Plaintiff received "the services he needs and [was] legally entitled to." Tr. 284-290.

Unsigned progress notes taken October 9, 2006 at St. John's show that Plaintiff had three Fs in school and that Plaintiff was taking Concerta, Risperdal, and Depakote. Tr. 395.

On October 27, 2006, seven of Plaintiff's teachers completed a Cap Rating Scale to rate

11

Plaintiff's behavior. The responses of the teachers varied from one another. One teacher wrote that Plaintiff had been in her class for two weeks and that she had "observed only positive things from [him]." Tr. 283, 293-299.

Records from St. Louis Regional Center, dated November 22, 2006, state Plaintiff was diagnosed at Axis I with Communication Disorder NOS, and at Axis III with "Other Convulsions." Tr. 268.

Mr. Slotky reported on November 23, 2006, that Plaintiff's mother was "a wholeheartedly negative individual who tend[ed] to make her son's [life] a living hell"; that "in these sessions she focus[ed] on everything negative that [Plaintiff was] doing and this is an exceptional kid"; and that "the big issue at hand was the fact that [Plaintiff] got into trouble due to the fact that his pants were sagging, which is customary." Tr. 313.

Mr. Slotky's notes from Plaintiff's November 30, 2006, session state that Plaintiff was "an exceptionally bright child who need[ed] a more structured environment"; that Plaintiff's medication needed adjustment; and that Plaintiff's mother was the "trigger" for his behavior at home. Tr. 300.

Plaintiff was seen by Dr. Fenton on January 10, 2007 for a follow-up appointment. Dr. Fenton's notes of this date state that Plaintiff's seizures were well-controlled by the Depakote; that "the bigger problem" was Plaintiff's "interaction" with his mother and "some difficult behaviors in other environments, including school"; that Plaintiff "tend[ed] to be disrespectful to some of the teachers and refus[ed] to follow the rules"; that Plaintiff did not think either the Risperdal or Concerta prescribed by Dr. Shanker was necessary, "since he [did] not see that he [had] any difficulties requiring medication"; that his mother "review[ed] her frustration with [Plaintiff's] behavior"; that Plaintiff's "examination [] was intact"; that his cranial nerves were grossly intact; that his reflexes were brisk and symmetric; and that his stance and gait were normal. Tr. 391-92.

Unsigned notes, dated January 15, 2007, from St. John's state that Plaintiff had written an essay on civil rights; that Plaintiff had been hiding pornography in his room; that Plaintiff was sexually active; that Plaintiff had said he was not violent and wanted to learn; and that Plaintiff's mother said Plaintiff was better and that he remained angry. Tr. 406.

On January 19, 2007, clinical neuropsychologist, F. Timothy Leonberger, Ph.D., conducted a psychological evaluation of Plaintiff to "aid in determining possible disability" arising from Plaintiff's epilepsy and behavior disorders. Dr. Leonberger's report states that Plaintiff had good attention and concentration during the interview; that Dr. Leonberger noticed no functional limitations; and that Plaintiff's mother had stated that Plaintiff *did* have functional limitations in the social, personal/behavioral, and concentration, persistence, and pace categories. Dr. Leonberger diagnosed Plaintiff, at Axis I, with ADHD, Combined Type and Oppositional Defiant Disorder; at Axis III, with a seizure disorder "by history"; at Axis IV, with academic and behavioral problems; and, at Axis V, a current GAF of 60. Tr. 319-22.

On January 31, and February 2, 2007, Abel Mora, M.D., and Judith McGee, Ph.D., respectively, signed a Childhood Disability Evaluation Form for Plaintiff. This form states that Plaintiff had an impairment or combination of impairments which were severe, but which did not meet, medically equal, or functionally equal the Listings. Tr. 323-24.

Unsigned progress notes, dated March 20, 2007, from St. John's state that Plaintiff had not seen Mr. Slotky in a while; that Plaintiff was enrolled in 10th grade at E. H. Lyle; that Plaintiff had earned six Fs and two Ds in school; that Plaintiff was sad; that Plaintiff had been suspended; that Plaintiff's mother had caught him doing drugs; that Plaintiff carried knives to school; that Plaintiff had told someone that he had a gun at home; and that Plaintiff took his cell phone to school in violation of school rules. Tr. 405.

On April 18, 2007, Joan McGinn administered the WISC-IV, WIAT-II, and the Behavior Assessment Systems for Children -2 to Plaintiff and completed an Educational Evaluation Report for Plaintiff. This Evaluation Report stated that Plaintiff's mother reported that Cardinal Glennon staff had "indicated that his aberrant behavior could be related to the Depakote he takes to control seizure activity"; that Plaintiff's mother did not see any significant changes in Plaintiff as a result of the Risperdal and Concerta he had been prescribed; that Plaintiff had an IQ of 95, which placed him at the 37th percentile among his peers and "in the average range of intellectual ability"; that Plaintiff's results indicated that he was "functioning below grade level in most areas"; and that the Behavior Assessment Systems for Children-2 forms completed by Plaintiff's mother and three of his teachers reflected that Plaintiff's "depression, aggression, conduct problems, and hyperactivity" were areas of concern. Ms. McGinn concluded that Plaintiff met "the eligibility criteria for an educational diagnosis of Other Health Impaired due to his seizure disorder" and did " not qualify for a diagnosis of Specific Learning Disability because his achievement [was] commensurate with his aptitude." Tr. 140-44.

School records reflect that Plaintiff received an Office Discipline Referral on May 9, 2007, at E.H. Lyle when he was tardy to class three times in one week. Tr. 139. The form stated that Plaintiff had received a three-day suspension; that Plaintiff had actually "stayed away" from school for nine days; that the teacher, Mrs. Jensen, had told Plaintiff "not to come back at all"; "however," the special education teacher had said Plaintiff should come back because the school could not expel a child "under an I.E.P." Tr. 139.

On June 4, 2007, staff at E.H. Lyle, Plaintiff, and Plaintiff's mother developed an IEP for Plaintiff. Tr. 146. The IEP noted that Plaintiff did not have a learning disability "according to criteria established by the State of Missouri"; that Plaintiff would receive special education services in the

form of "[b]ehavior [i]ntervention" for ninety minutes each week; and that Plaintiff would get accommodations such as an "alternative setting" for exams and "preferential seating" in the classroom. Tr. 146-155.

July 18, 2007 records reflect that Plaintiff was seen by Alpa Vashist, M.D., at Cardinal Glennon. Dr. Vashist reported on this date that Plaintiff was taking Depakote and Concerta; that Plaintiff had been on Risperdal; that the Risperdal had recently been discontinued by a psychiatrist; that Plaintiff's epilepsy was well-controlled; that Plaintiff had not suffered a seizure in three years; that Plaintiff had significant behavior disorders, including ADHD and oppositional defiant disorder; that after reviewing Plaintiff's EEG taken that day, Dr. Vashist recommended that Plaintiff continue taking Depakote; that Plaintiff's most recent EEG showed "rare spikes in his right frontal lobe"; that Depakote would help control Plaintiff's behavior; that Dr. Vashist would order another EEG soon; that if the new EEG showed Plaintiff was "clinically seizure free," Dr. Vashist would consider his tapering off Depakote because Plaintiff did not want to take it; that Dr. Vashist recommended continuing with both psychiatry and therapy appointments; and that "nothing seems to be working for [Plaintiff] right now." Tr. 389-90.

Lab records reflect that a test of Plaintiff's urine sample collected on July 26, 2007, detected no drugs. Tr. 225-227.

On August 28, 2007, Dr. Shanker reported that Plaintiff had a diagnosis of Bipolar I Disorder, Most Recent Episode Mixed, Moderate. Tr. 404.

Cleveland school records show Profile Disciplinary Details were written for Plaintiff on September 6 and 27, October 16, 17, and 31, November 6 and 29, December 4, 13, and 18, 2007, and January 7 and 29, February 13, and March 3, 2008. Tr. 157-158, 160-171.

It was reported on October 19 and November 16, 2007, and January 9, 2008, that Plaintiff was making progress towards his IEP annual goal, and it was reported on February 6, 2008, that Plaintiff was not making progress in this regard. Tr. 335.

On November 1, 2007, Plaintiff and his mother met with Devi Erikson, a DD Resources Service Advocate, seeking support to reapply for SSI benefits and other assistance. In the Support Plan they developed, it was noted that Plaintiff's mother felt Plaintiff required "constant supervision" because of his behavior; that Plaintiff needed further support beyond the counseling provided by Paula Ellis of Family Support Network; and that, as part of the Support Plan, Plaintiff would receive help to access a variety of community assistance programs. Tr. 204-212.

Unsigned progress notes, dated December 21, 2007, from St. John's reflect that Plaintiff had not seen Mr. Slotky for some time, and that Plaintiff had been suspended from school for play fights. Tr. 403.

On January 11, 2008 Plaintiff's parents were notified, by letter, that Plaintiff had been placed on probation at Cleveland; that the probation was the result of academic and disciplinary failures; and that Plaintiff might be disenrolled from Cleveland if the deficiencies were not corrected. Tr. 341.

Dr. Fenton examined Plaintiff on January 14, 2008, for a followup. Dr. Fenton's records of this date state that Plaintiff had been seizure free for five years; that Plaintiff's most recent EEG "was unchanged from prior studies; that "[d]espite the persistent EEG abnormality," Dr. Fenton recommended lowering Plaintiff's dosage of Depakote; that after one month on the lower dose, he recommended that Plaintiff discontinue the Depakote completely; that Plaintiff had been healthy and sleeping well; that Plaintiff had not had significant intercurrent illnesses; that Plaintiff was alert and cooperative; that his motor tone and strength were normal; that his reflexes were brisk and symmetric; and that his stance and gait were normal. Tr. 387-388.

Plaintiff's report card from Cleveland on March 24, 2008 showed that Plaintiff received one A, two Bs, one C, and three Fs that term. Tr. 159, 333, 339, 342.

In a letter signed April 1, 2008, Dr. Fenton noted that Plaintiff's anticonvulsant medication had been discontinued in February 2008, "as it appear[ed] that he has outgrown the seizure condition." Tr. 343.

On April 4, 2008, Plaintiff's parents were notified by letter that Plaintiff had been placed on probation at Cleveland; that his probation was the result of academic and disciplinary failure; that Plaintiff had failed three classes at the end of the third quarter of the 2007-2008 school year; that Plaintiff had either twelve reports of disciplinary infractions or had been assigned extra military instruction twelve times; and that Plaintiff might be disenrolled from Cleveland if the problems were not corrected. Tr. 331.

Records from Grace Hill show that Plaintiff visited the clinic on April 17, 2008 complaining of frequent nosebleeds for the past one to two months; that Plaintiff was shown the proper method of stopping nosebleeds; and that Plaintiff was instructed that if the nosebleed did not stop with this treatment, Plaintiff should go to the emergency room. Tr. 222-223.

Ms. Bozeman stated in Plaintiff's May 23, 2008 IEP that Plaintiff socialized with classmates instead of going into the classroom and sitting down; that "generally," Plaintiff had been compliant with teachers' requests to stop unwanted behaviors; that there were times when Plaintiff needed to take a time out; that Plaintiff struggles with math; that Plaintiff enjoyed writing and used it as a tool to express himself; that he was "very outgoing and fun to be around"; that he had a "personality that [drew] individuals to him easily"; that he was a "great charmer"; that he was "groomed daily"; that he took "pride in his appearance"; that Plaintiff's strengths would allow him to seek out assistance and carry on an interview with individuals; that since his previous IEP Plaintiff was not as defiant and

insubordinate as he had been at his previous school; that in the prior few weeks Plaintiff had made decisions that ended in an out of school suspension; that Plaintiff was administered the WISC-IV, BASC-2Self; that WISC results indicated that Plaintiff had a cognitive IQ of 95; that Plaintiff did not have a learning disability according to criteria established by the State of Missouri; that WIAT results showed that Plaintiff's reading and reading comprehension was average, that his math computation and listening comprehension were in the low average range, and that his written expression was a relative strength; that Plaintiff's adaptive behaviors as measured by respondents on the BASC indicate aggression, hyperactivity, and depression; that Plaintiff met eligibility criteria of other health impaired; that Plaintiff's scores on the Kaplan Benchmark tests were the same as his non-disabled peers; and that Plaintiff completed these tests in the allotted time frame. Tr. 346-49.

On June 17, 2008 Plaintiff was notified, by letter, that he would not be allowed to attend Cleveland for the 2008-2009 school year; that Plaintiff had received 18 Discipline Referrals during the 2007-2008 year; and that Plaintiff had failed five classes. Tr. 216.

Records from Grace Hill reflect that Plaintiff presented at the clinic on June 24, 2008, complaining of a wound on his left thigh, and that Plaintiff was instructed to continue the medication he was given in the emergency room, keep the area clean, and return to the clinic if his fever increased or symptoms worsened. Tr. 219-200.

Mr. Slotky reported on July 21, 2008, that Plaintiff "was proud to note that he recently got a job doing odd jobs in a local restaurant"; that Plaintiff's mother said that Plaintiff's employer "was not necessarily pleased with [Plaintiff] due to his working at a slower pace"; that Mr. Slotky was "unsure if this was due to [Plaintiff's] recreational use of marijuana or due to the medications"; and that Plaintiff's mother denied "the drug portion" and explained that she had taken him off his psychiatric medications so that his slow pace at work could not be attributed to his medications. Tr.

428.

Dr. Shanker reported on September 16, 2008, that Plaintiff was having significant academic and behavior problems at school; that Plaintiff had been "put out" of Cleveland; that Plaintiff had, at one time, said he wanted to kill himself; that Plaintiff said he no longer felt that way; that Plaintiff was "angry" most of the time; that Plaintiff was having sex in his parents' home; and that Plaintiff was diagnosed, at Axis I, with ADHD and Bipolar Affective Disorder Type II, and, at Axis II, with Conduct Disorder. Tr. 402.

Mr. Slotky completed a questionnaire regarding Plaintiff on September 20, 2008. Mr. Slotky stated in this questionnaire that Plaintiff had marked limitations in his ability to behave in an emotionally stable manner; that Plaintiff had moderate limitations in his abilities to cope with normal work stress, to maintain reliability, to maintain socially acceptable behavior, and to maintain regular attendance and be punctual; that Plaintiff probably needed a structured, calm environment rather than medications; that Mr. Slotky believed the "most recent diagnosis that would fit for [Plaintiff] might be," at Axis I, Conduct Disorder, rule out bipolar disorder, rule out anxiety disorder; that, at Axis III, Mr. Slotky reported that Plaintiff's relationship with his family was Plaintiff's "biggest trigger"; and that, at Axis IV, Plaintiff's GAF was 65. Mr. Slotky also stated that in the prior year Plaintiff's GAF ranged from 55 to 70. Tr. 370-74.

On September 22, 2008, Plaintiff's teacher Shurtel Bozeman completed a Teacher Questionnaire. In the domain of "Acquiring and Using Information," Ms. Bozeman noted that Plaintiff had a marked limitation in applying problem solving skills and solving math problems and that Plaintiff had a moderate limitation in six other areas of acquiring and using information. In the domain of "Attending and Completing Tasks," Ms. Bozeman noted that Plaintiff had extreme limitations in his ability to work without needing task redirection, to control his impulses, to avoid

becoming easily frustrated, and to complete homework assignments on time; that Plaintiff had marked limitations in his ability to focus and maintain attention, to carry through and finish activities, to work independently, to avoid being fidgety, overactive, or restless, to look ahead and predict possible outcomes before acting, to anticipate the time needed to finish a task, to remember and organize school materials, and to complete classroom assignments on time; and that Plaintiff had moderate limitations in five other areas of attending and completing tasks.  Tr. 366-67.

Ms. Bozeman further reported on September 22, 2008, that in the domain of "Interacting and Relating With Others," Plaintiff had extreme limitations in his ability not to act aggressively, ability to avoid fighting with peers, ability not to be disruptive or talk out of turn, and in his ability to obey authority.  She further reported that Plaintiff had marked limitations in his ability to follow rules, to avoid temper outbursts, to take turns in and maintain a conversation, to tolerate differences, and to consider others' feelings and points of view.  Ms. Bozeman stated that Plaintiff had no limitations in his abilities in the domain of "Moving About and Manipulating Objects," and that in the domain of "Caring for Self" Plaintiff had a marked limitation in his ability to cope with stress. Tr. 368-69.

Paula Ellis, of Family Support Network, stated in a Treatment Summary, dated September 24, 2008, that Plaintiff and his mother had seen Ms. Ellis for in-home family therapy over the course of fourteen months; that Ms. Ellis completed 52 sessions with Plaintiff and his mother "to help control his verbally aggressive behavior"; that Plaintiff had been suspended from school several times; that Plaintiff exhibited aggressive behavior at both E. H. Lyle and Cleveland; that Plaintiff was "an active and willing participant" in therapy; that Plaintiff sometimes became verbally aggressive and struggled to control his anger during therapy; that Plaintiff struggled to make "appropriate choices"; that Plaintiff could articulate an appropriate action; that Plaintiff could "say the appropriate action when guided, but had difficulty following [through] on the thought"; and that Plaintiff's therapy focused

on "re-directing anger, understanding emotions, use of effective communication skills, parenting skills and use of effective discipline technique." Tr. 418-419.

Dr. Shanker completed a Mental Medical Source Statement on October 13, 2008, in which he rated the level of Plaintiff's limitation with regard to various activities. Dr. Shanker noted that Plaintiff had no episodes of decompensation; that Plaintiff's diagnosis was bipolar disorder type II, ADHD, and conduct disorder; that Plaintiff's GAF ranged from 55 to 58 in the past year; and that currently his GAF was 55. Tr. 421-423.

Mr. Slotky reported on October 13, 2008, that Plaintiff "stopped his work on the account that he believed that they were racist"; that "the reality of it [was] that he just didn't show up for work which looks badly on him"; that Plaintiff was taking GED classes and was back on medications; that his "mom [was] bucking for a disability check, but this [was] not encouraged by counselor at all"; and that Plaintiff had the "possibility and interest in working." Tr. 430.

## IV.
## LEGAL STANDARD FOR CHILD DISABILITY CASES

20 C.F.R. § 416.906 (2000) provides the definition for disability in children. That provision states:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

In determining disability, the ALJ must utilize a sequential evaluation process set forth in 20 C.F.R. § 416.924 (2000). The ALJ first determines whether plaintiff is doing substantial gainful activity. If so, the plaintiff is not disabled. 20 C.F.R. § 416.924(b). If not, the ALJ considers plaintiff's physical or mental impairment to determine whether plaintiff has a medically determinable impairment(s) that is severe. 20 C.F.R. § 416.924(c). If the impairment(s) is not medically

21

determinable or is a slight abnormality that causes minimal limitations, the ALJ will find that plaintiff does not have a severe impairment and is not disabled. 20 C.F.R. § 416.924(c). If the impairment(s) is severe, it must meet, meet, or medically or functionally equal the listings. 20 C.F.R. § 416.924(d).

Further, when determining functional limitations, 20 C.F.R. § 416.926a(a) (2002) provides that where a severe impairment or combination of impairments does not meet or medically equal any listing, the limitations will "functionally equal the listings" when the impairment(s) "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." The ALJ considers how a plaintiff functions in activities in the following six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating to others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). A limitation is "marked" when it "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §416.926a(e)(2). A limitation is "extreme" when it "interferes very seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §416.926a(e)(3).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939

F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

"While the claimant has the burden of proving that [his] disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 902 F.2d 661, 664 (8th Cir.

1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

**V.**
**DISCUSSION**

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

The ALJ found that Plaintiff who was born on March 24, 1991, was an adolescent on the date his application was filed and at the time the ALJ issued his decision; that Plaintiff had severe impairments of controlled seizures, ADHD, and conduct disorder; and that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. The ALJ considered the six domains of function to be considered when determining whether a child should be found disabled and concluded that Plaintiff had less than marked limitations in four domains (acquiring and using information, attending and completing tasks, interacting and relating with others, and the ability to care for himself) and no limitations in two domains (moving about and manipulating objects and health and physical well-being). Because Plaintiff did not have

an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, the ALJ found that Plaintiff was not disabled.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ erred in giving controlling weight to the opinion of Dr. Horner; because the ALJ did not properly evaluate the opinion of Dr. Shanker, a treating physician; and because the ALJ did not properly evaluate evidence from Ms. Bozeman.

## A.     Opinion of Gary C. Horner, Ph. D:

Dr. Horner, a psychologist, reviewed the record and testified as a medical expert. After reviewing the record, Dr. Horner concluded that, in his opinion, none of Plaintiff's impairments met the criteria of an impairment in the Listings of Impairments. In particular, Dr. Horner considered that Plaintiff had some good grades and some failing grades and that he had been described as bright and very much like other teenagers. Dr. Horner also specifically considered the six domains used to evaluate children and testified that Plaintiff had less than marked limitations in the following four domains:(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; and (4) caring for himself. Dr. Horner found that Plaintiff had no limitations in the following two domains: (1) moving about and manipulating objects, and (2) health and physical well-being. Upon considering the additional evidence submitted by Plaintiff's attorney, Dr. Horner affirmed his conclusions. In regard to the additional evidence, Dr. Horner specifically relied on Mr. Slotky's statements that a critical factor in Plaintiff's problems was his relationship which his parents; that Plaintiff's seizure disorder was not active; and that Dr. Shanker also reported problems with Plaintiff's family. The ALJ's conclusions in regard to the six domains were consistent with those of Dr. Horner.

Plaintiff argues that, because Dr. Horner was not a treating source, Social Security Ruling ("SSR") 96-2p precludes his opinion being given controlling weight. The Regulations, however, distinguish between a "medical opinion" and a "medical source opinion on an issue reserved to the Commissioner." In this regard, where the issue is whether a claimant medically or functionally equals a listing impairment, SSR 96-2p does not apply. See 71 Fed. Reg. 10419, 10425 (March 1, 2006).[4]

Additionally, SSR 96-6p states that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."

Additionally, 20 C.F.R. § 416.926a(n) provides, in relevant part:

Responsibility for determining functional equivalence. In cases where the State agency or other designee of the Commissioner makes the initial or reconsideration disability determination, a State agency medical or psychological consultant or other designee of the Commissioner (see § 416.1016 of this part) has the overall responsibility for determining functional equivalence. In claims adjudicated at the initial level under the procedures in part 405 of this chapter, the medical or psychological expert (as defined

---

[4]  71 Fed. Reg. at 10425 provides:

As we explained in the preamble to the NPRM (70 FR at 35190), "[u]nder §§ 404.1527(a) and 416.927(a) of our regulations, the term 'medical opinion' has a specific meaning that does not include opinions about medical equivalence." Sections 404.1527(a)(2) and 416.927(a)(2) of our regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." The term "medical opinion" is different from the term "medical source opinions on issues reserved to the Commissioner," which we define in §§ 404.1527(e) and 416.927(e) of our regulations. In those sections, we explain that opinions on some issues are not "medical opinions," and we follow with examples of such opinions. In §§ 404.1527(e)(2) and 416.927(e)(2), we explain that opinions from medical sources about whether an impairment(s) meets or medically equals the requirements of a listing are "opinions on issues reserved to the Commissioner."

in § 405.5 of this chapter) has the overall responsibility for determining functional equivalence. For cases in the disability hearing process or otherwise decided by a disability hearing officer, the responsibility for determining functional equivalence rests with either the disability hearing officer or, if the disability hearing officer's reconsideration determination is changed under § 416.1418 of this part, with the Associate Commissioner for Disability Programs or his or her delegate. For cases at the administrative law judge or Appeals Council level, the responsibility for deciding functional equivalence rests with the administrative law judge or Appeals Council.

As such, the court finds that the ALJ properly gave proper weight to Dr. Horner's opinion. The court further finds that the ALJ's decision in this regard is supported by substantial evidence and is consistent with the Regulations and case law.

**B.      The Opinion of Dr. Shanker:**

Dr. Shanker was Plaintiff's treating physician. As stated above, Dr. Shanker stated in a Mental Medical Source Statement, dated October 13, 2008, among other things, that Plaintiff had marked limitations[5] in regard to his ability to behave in an emotionally stable manner, ability to interact with the general public, accept instructions and respond to criticism, maintain socially acceptable behavior, and ability to maintain regular attendance and be punctual, maintain attention and concentration for extended periods, and ability to work in coordination with others. In other areas, Dr. Shanker reported that Plaintiff had moderate limitations.[6] Dr. Shanker also reported that Plaintiff had a GAF of 55 and that his highest score in the prior year was 58.

The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v.

---

[5]      On the form, "marked" limitation was defined as a "limitations that seriously interferes with the ability to function independently, appropriately, and effectively. More than moderate, but less than extreme." Tr. 421.

[6]      "Moderate" limitation was defined on this form as "significant functional limitation that is more than minimal." Tr. 421.

Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)).

SSR 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

The ALJ in the matter under consideration addressed reasons why he did not afford Dr. Shanker's opinion controlling weight. First, the ALJ considered that Dr. Shanker's opinion was rendered pursuant to a checklist form provided by Plaintiff's attorney. The Eighth Circuit holds that a treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996).

Second, the ALJ noted internal inconsistences in Dr. Shanker's medical source statement. In this regard, Dr. Shanker indicated that Plaintiff had marked limitations in several areas but also stated that Plaintiff had a GAF which had varied between 55 and 58 during the prior year. GAF scores within this range indicate only moderate limitations. See n. 2. Where a physician renders inconsistent opinions, an ALJ may properly afford little weight to the physician's opinion. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (holding a treating physician's rendering inconsistent

opinions undermines the credibility of such opinion).

Third, the ALJ considered that other evidence of record is inconsistent with Dr. Shanker's opinion. An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013; Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record). Additionally, "it is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). In regard to Plaintiff's GAF, Dr. Leonberger, a consultive psychologist, reported that Plaintiff had a GAF of 60, indicating moderate limitations, and Mr. Slotky reported that Plaintiff's GAF varied between 55 and 70, which scores indicate mild to moderate functional limitations.

Fourth, the court notes that Dr. Shanker did not state the basis for his opinion on the Medical Source Statement. While Dr. Shanker opined that Plaintiff had marked limitation in the ability to maintain attention and concentration for extended periods, Ms. McGinn, who administered a battery of tests to Plaintiff, concluded that he demonstrated adequate task focus and persistence with no fatigue. Tr. 141. Likewise, Dr. Leonberger tested Plaintiff by asking him to name current and past presidents, news items, and U.S. cities and by asking him to perform serial seven and serial three tests. Dr. Leonberger reported that Plaintiff was able to perform these tasks without difficulty. Tr. 321. While Dr. Shanker reported that Plaintiff had moderate limitations in regard to his ability to understand and remember even simple instructions, results of the WISC-IV administered by Ms. McGinn showed that Plaintiff had a full scale IQ of 95, placing him in the thirty-seventh percentile and in the average range of intellectual ability. Tr. 141. Moreover, Plaintiff's May 2008 IEP reflected

that he was able to complete tasks in the allotted time; that he was in a regular class at least eighty percent of the time; that he did not have a learning disability pursuant to State criteria; and that his reading comprehension was in the average range. See Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion should not be given controlling weight where it is not supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence); Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion).

Fifth, Dr. Leonberger opined that Plaintiff's ADHD was fairly well controlled with medication. Conditions which can be controlled by treatment are not disabling. See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450.

Sixth, although Dr. Shanker reported that Plaintiff's behavior deteriorated in September 2008, when he was removed from school, Plaintiff's mother had taken him off his psychiatric medications as of July 2008, according to Mr. Slotky's notes. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment is inconsistent with an allegation that he is disabled). Mr. Slotky reported in October 2008, however, that Plaintiff was back on his medications and was taking GED classes. Further, Mr. Slotky reported in October

2008 that Plaintiff stopped working because he believed "they were racist." Leaving work for reasons unrelated to an alleged disabling impairment weighs against a finding of disability. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Also, in October 2008, Mr. Slotky noted that Plaintiff's mother was "bucking for a disability check." An ALJ may discount a claimant's subjective complaints for, among other reasons, that he appeared to be motivated to qualify for disability benefits. Eichelberger, 390 F.3d at 590 (holding that although the ALJ found that the claimant had objectively determinable impairments, the ALJ properly considered that the claimant's incentive to work might be inhibited by her long-term disability check of $1,700 per month); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir.1996) (holding that the ALJ properly considered a strong element of secondary gain upon discrediting the claimant).

Seventh, as noted by the ALJ, Mr. Slotky, Plaintiff's problems were mainly environmental as they were based on his problems with his parents. Additionally, as noted by the ALJ, Dr. Shanker noted that Plaintiff had family problems. A condition which is situational cannot be the basis for finding a claimant disabled. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations).

Eighth, the ALJ considered that Dr. Shanker did not report extreme limitations until September 2008, although he had treated Plaintiff before that date.

The court finds that the ALJ properly considered the record as a whole and properly resolved conflicting opinions when determining the weight to be given Dr. Shanker's opinion. See Estes, 275 F.3d at 725; Hogan, 239 F.3d at 961. The court further finds that the ALJ articulated good reasons for not giving controlling weight to Dr. Shanker's opinion. See 20 C.F.R. §§ 404.1527 and 416.927.

In fact, pursuant to the evidence of record, the ALJ would have erred had he given Dr. Shanker's opinion controlling weight. See SSR 96-2p. As such, the court finds that the ALJ's determination of the weight to be given Dr. Shanker's opinion is supported by substantial evidence and that it is consistent with the Regulations and case law.

**C.      Opinion of Ms. Bozeman:**

Ms. Bozeman completed a Teacher Questionnaire on September 22, 2008, in which she opined that Plaintiff had marked limitations in at least two domains and extreme limitations in at least one domain. Plaintiff contends that the ALJ did not adequately explain why he did discounted Ms. Bozeman's opinion.

The ALJ stated that Ms. Bozeman's opinion was entitled to little weight because it appeared to be based solely on Plaintiff's behavior in September 2008, just prior to the hearing. The ALJ found this suspect as Plaintiff was performing at acceptable levels prior to September 2008; he had been working in a deli and planned to attend GED classes. As noted by the ALJ, it was reported that in October 2008 Plaintiff went back on medication and records after this date were not submitted to the ALJ.

Moreover, Ms. Bozeman was a non-medical source. "[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight." SSR 06-03p. Even if Ms. Bozeman were considered an "other source," the ALJ is not bound by her opinion and the ALJ has more discretion in regard to the weight to be given her opinion. Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). As such, the court finds that the ALJ gave proper weight to the opinion of Ms. Bozeman and that the ALJ's decision in this regard is supported by substantial evidence.

## VI.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Complaint and in his Brief in Support of Complaint is **DENIED**;  Docs. 1, 14


/s/Mary AnnL Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this <u>22nd</u> day of February, 2011.